No. 24454

Dorothy E. Davidson v. Arthur G. Dill, substituted for George L. Seaton, as Chief of Police, Police Department in and for the City and County of Denver, and Lieutenant Thomas L. O'Neill

(503 P.2d 157)

Decided November 13, 1972.

124

Ralph B. Rhodes, for plaintiff in error.

Max P. Zall, Chief Attorney, James H. Snyder, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

Plaintiff in error, Dorothy Davidson, seeks reversal of the trial court's order granting the motion of defendants in error to dismiss her complaint for failure to state a claim upon which relief can be granted. For the reasons stated herein, we reverse and remand.

On July 25, 1968, Dorothy Davidson was arrested for loitering, in violation of municipal ordinance No. 824.3-1 of the city and county of Denver. She was fingerprinted, photographed, and required to furnish personal statistics, all

of which data were reduced to writing and placed in the criminal identification files of the Denver police department. On December 23, 1968, she was tried and acquitted by a county court jury.

Mrs. Davidson subsequently brought an action in the Denver district court against George L. Seaton, then Chief of Police, and Lieutenant Thomas L. O'Neill, custodian of her records. Her complaint alleged that prior to her arrest and acquisition of an arrest record she had never been accused of or arrested for violation of any laws, nor convicted of a crime (with the exception of minor traffic violations); that there exists no statute or municipal ordinance granting the Denver police department authority to retain an acquitted person's arrest records; that she demanded the return of the arrest records, but her demand was refused; and that the retention of these records is an invasion of her right to privacy. She asked for relief in the nature of a mandamus ordering the Denver police department to expunge her arrest records or, in the alternative, for an order compelling their return to her.

The sole issue presented on appeal is whether the trial court erred in dismissing their action pursuant to C.R.C.P. 12(b)(5) for failure to state a claim upon which relief can be granted. Plaintiff in error's assignments of error are all directed to that court's failure to recognize her right of privacy and the alleged violation of this right by the failure of the police, without factual justification upon her acquittal, to return her arrest records to her. Defendants in error, on the other hand, urge that the mere retention by the police of an acquitted person's arrest records does not give rise to an actionable claim. They also argue that, in the absence of a statute so directing, no individual has the right to compel the return or expungement of properly obtained arrest data.

I.

Recent years have witnessed a substantial upsurge in the number of cases and commentaries dealing with the problem before this Court. In no small part, this phenomenon is due to the advent of the computer age — an event which has drastically increased the power of industry and government

to collect data — and the growing concern for the individual's loss of privacy as a natural by-product of our modern technology. *A. Miller, Assault on Privacy,* p. 67; *see also,* Countryman, *The Diminishing Right of Privacy: The Dossier and the Computer,* 49 Tex. L. Rev. 837 (1971).

Present day technology and modern police investigatory procedures have combined to produce a situation in which the arrested individual has a record on file in at least one, and probably several, law enforcement data centers. It is common knowledge that local enforcement agencies are requested to forward their data pertaining to arrests to the Federal Bureau of Investigation.[1] The number of people affected by these practices is staggering. Although the exact number of individuals arrested in the United States is unknown, the FBI reported that on the basis of returns representing 21% of the population a total of 5,773,998 arrests were made in 1969. *Federal Bureau of Investigation, U.S. Department of Justice, Crime in the United States: Uniform Crime Reports,* 108-109 (1969).[2]

A second reason for the increased interest in the arrest record problem is an awareness of the economic and personal harm to an individual that results if his arrest becomes

---

1. Comment, *Discriminatory Hiring Practices Due to Arrest Records — Private Remedies,* 17 Vill. L. Rev. 110, n. 4 (1971). Many jurisdictions have instant access to these FBI records through cooperative computer time-sharing programs. For examples indicating the rapid movement toward computerization of arrest files, see Comment, *Retention and Dissemination of Arrest Records: Judicial Response,* 38 U. Chi. L. Rev. 850, 852, n. 10 (1971).

2. The statistics do not reveal how many people arrested were not convicted. However, the FBI reports reveals a rough trend. Data covering a population exceeding 66 million showed that in 1969, of 2,407,979 persons charged, 15.9% or 382,074 were acquitted or had their charges dismissed. *Uniform Crime Reports, supra,* at 102. And, according to the California Bureau of Criminal Statistics, an estimated 50% of felony arrests and over 40% of misdemeanor arrests in that state in 1971 resulted in release, dismissal, or acquittal. Karabian, *Record of Arrest: The Indelible Stain,* 3 Pac. L. Jour. 20, 21, n. 2 (1972).

known to employers, credit agencies, or even neighbors. Notwithstanding the absence of a conviction, the mere record of arrest often works as a serious impediment and basis of discrimination in the search of employment, in securing professional, occupational, or other licenses, and in subsequent relations with the police and the courts. Most employers and employment agencies inquire whether an applicant had been arrested. An affirmative answer to this question, regardless of whether a conviction resulted, is often sufficient to deny the applicant further consideration. Where there are two or more applicants for the same job, those with previous arrest records clearly stand in a less favorable position that do other applicants.[3]

Moreover, it is common knowledge that a man with an arrest record is much more apt to be subject to police scrutiny — the first to be questioned and the last eliminated as a suspect in an investigation. If he is subsequently arrested, his arrest record may arise to haunt him in presentence reports, which often include not only prior convictions but also prior arrests. *United States v. Cifarelli*, 401 F.2d 512 (2d Cir. 1968). Prosecutors use arrest records in determining whether or not to formally charge an accused or even whether or not to allow a person to sit as a juror. *Losavio v. Mayber*, 178 Colo. 184, 496 P.2d 1032. And the existence of an arrest record often results in the denial of bail pending trial. *Menard v. Mitchell*, 430 F.2d 486 (D.C. Cir. 1970). The seriousness of the arrest record problem, although perhaps questionable in the past, is now too well documented to be doubted.[4]

---

3. According to a recent study of employment agencies, 75% of those agencies sampled refused to refer an applicant with an arrest record. *President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society,* 75 (1967). *See also, Morrow v. District of Columbia,* 417 F.2d 728 (D.C. Cir. 1969), citing the results of what has come to be known as the "Duncan Report" on job discrimination due to arrest records in the District of Columbia. Re: "Credit Ratings," see *A. Miller, supra,* 67-90.

4. In addition to the above authorities, see: Note, *Discrimination on the*

▮▮▮ A third impetus for the recent concern over the use of arrest records is the nascent recognition by our courts and legislatures that there exists in the individual a fundamental right of privacy — the right to be let alone. The parameters of this right were first extensively discussed in the famous law review article written in 1890 by Samuel D. Warren and Louis D. Brandeis, *The Right of Privacy,* 4 Harv. L. Rev. 193. Seventy-five years later, the United States Supreme Court decided *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, holding for the first time that there is a constitutional right to privacy.[5] The Court noted in giving substance to this right that it was dealing with a "right to privacy older than the Bill of Rights, so rooted in the traditions and conscience of our people as to be ranked fundamental.[6]

▮ In *Rugg v. McCarty,* 173 Colo. 170, 476 P.2d 753, this Court recognized the right to privacy, stating:

"* * * We are urged to specifically recognize the theory of tortious conduct designated as the invasion of the right of privacy. We now do so, noting that our general assembly gave legislative recognition of the right of privacy by the enactment of 1967 Perm. Supp., C.R.S. 1963, 40-4-33, in

---

*Basis of Arrest Records,* 54 Cornell L. Q. 470 (1971); Comment, *The Right of Police to Retain Arrest Records,* 49 N.C. L. Rev. 509 (1971); Note, *Maintenance and Dissemination of Records of Arrest Versus the Right to Privacy,* 17 Wayne L. Rev. 995 (1971); Comment, *Arrest Record Expungement — A Function of the Criminal Court,* 1971 Utah L. Rev. 381; and Comment, *FBI Arrest Records: The Need to Control Dissemination,* 1970 Wash. U.L. Q. 530.

5. In the majority opinion by Justice Douglas, the Court expanded this right beyond the limits of the enumerated protections found in the Bill of Rights and gave it an independent existence, finding its source in the "penumbras" of the First, Third, Fourth, Fifth and Ninth Amendments to the United States Constitution.

6. The privacy doctrine has received further support since *Griswold. See Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010; *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542; and *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349.

connection with the wiretapping and eavesdropping statute, which provides: 'There exists in the state of Colorado a right of privacy, an invasion of which may be compensated by damages.' "

However, we did not there attempt to comprehensively define the right of privacy, nor to categorize the character of all invasions which might constitute a violation of this right.

## II.

In considering the problem at hand, we find that the case law reflects a concern for the harm caused by arrest records, although an analysis reveals that, at best, courts are in conflict over the proper use of arrest records and what role, if any, the judiciary should play.

Until recently, most courts summarily denied litigants' pleas to secure the return of their arrest records upon acquittal or dismissal of charges against them. They reasoned that the needs of effective law enforcement outweigh any harm to the individual and that the legislature, not the courts, should determine the proper use of arrest records. *Herschel v. Dyra,* 365 F.2d 17 (7th Cir. 1966); *Spock v. District of Columbia,* 283 A.2d 14 (D.C. Ct. App. 1971); *Sterling v. City of Oakland,* 208 Cal. App. 2d 1, 24 Cal. Rptr. 696; *Mulkey v. Purdy,* 234 So.2d 108 (Fla.); *Kolb v. O'Connor,* 14 Ill. App. 2d 81, 142 N.E.2d 818; *Weisberg v. Village,* 46 Misc. 2d 846, 260 N.Y.S.2d 554.

Cases granting petitioners' request for expungement or return of their arrest records fall into several categories. The oldest of these cases granted relief only if petitioner could point to improper dissemination of his records, such as their release to newspapermen or their placement in a "rogue's gallery" after his acquittal. *See Itzkovitch v. Whitaker,* 115 La. 479, 39 So. 499; *Schulman v. Whitaker,* 117 La. 704, 42 So. 227; and *Reed v. Harris,* 348 Mo. 426, 153 S.W.2d 834.

A second group of cases of more recent origin has ordered the expungement of arrest records where, due to the impropriety of the original arrest, the records serve no legitimate police function. *Menard v. Mitchell,* 430 F.2d 486 (D.C. Cir. 1970); *United States v. Mcleod,* 385 F.2d 734 (5th

Cir. 1967); *Gomez v. Wilson,* 323 F. Supp. 87; *Wheeler v. Goodman,* 306 F. Supp. 58; *Hughes v. Rizzo,* 282 F. Supp. 881.

A final group of cases, which we consider to be persuasive and which lead to the result we here reach, has held that a court should expunge an arrest record or order its return when the harm to the individual's right of privacy or dangers of unwarranted adverse consequences outweigh the public interest in retaining the records in police files. *United States v. Kalish,* 271 F. Supp. 968; *Kowall v. United States,* 53 F.R.D. 211; *Eddy v. Moore,* 5 Wash. App. 334, 487 P.2d 211. *Eddy v. Moore, supra,* is the most recent case and most similar to the case here under consideration. Harriet Eddy was arrested, charged with assault, and the normal arrest data were recorded by the Seattle police department. At trial, charges against her were dismissed. She then brought an action against the Seattle police chief to obtain the return of her arrest records. The trial court dismissed her claim, holding she had no legal right to their return. The appellant court reversed, stating:

"We do not mean to hold that the right of privacy an acquitted person has in his fingerprints and photographs is an absolute and complete bar to their retention. The value of fingerprints and photographs of an arrested person depends upon two factors: An assumption the individual arrested did in fact commit the crime for which he is accused and that his commission of this crime indicates a likelihood that other crimes will be committed. An acquittal seems to negate both premises. Where the only reason for the presence of an individual's fingerprints and photographs in the police file is based upon an arrest which has subsequently been voided by an acquittal and no further justification is made for the retention of these fingerprints and photographs, no rational basis for their retention remains.

\* \* \*

"\* \* \* The courts have recognized in *Kalish* and *Menard* that following an acquittal, the scales of justice required the balancing on one side of a plaintiff's legitimate concern over

the improper use of, labeling, or existence of his fingerprints, photographs, and arrest records against the government's bald assertion of a right to hold them. We have now reached the point where our experience with the requirements of a free society demands the existence of a right of privacy in the fingerprints and photographs of an accused who has been acquitted, to be at least placed in the balance, against the claim of the state for a need for their retention.

"We believe the right of an individual, absent a compelling showing of necessity by the government, to the return of his fingerprints and photographs, upon an acquittal, is a fundamental right implicit in the concept of ordered liberty and that it is as well within the penumbras of the specific guarantees of the Bill of Rights 'formed by emanations from those guarantees that help give them life and substance.' Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

"It will take a compelling showing on the part of the state to justify a retention of the fingerprints and photographs. * * *"

### III.

■ The record here is silent concerning the findings of the trial court in granting defendants' motion to dismiss for failure to state a claim. The trial court did not have the benefit of *Rugg v. McCarty, supra,* which was subsequently decided by this Court. The right to privacy having been specifically recognized by this Court in *Rugg,* the question is whether the complaint tested by our rules of pleading, C.R.C.P. 8(a), (e) and (f), states a claim upon which relief could be granted. Motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted under our "notice pleadings."

■ The test most often applied to determine the sufficiency of a complaint was set forth in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80, was followed in numerous cases, and is as follows:

"* * * [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief."
*Sprott v. Roberts,* 154 Colo. 252, 390 P.2d 465; *People ex rel. Bauer v. McCloskey,* 112 Colo. 488, 150 P.2d 861. Moreover, courts should be wary of dismissing a case where the pleadings show that an alleged violation of a constitutional right is at issue, since fundamental rights and important public policy questions are necessarily involved. 5 *Wright & Miller, Federal Practice and Procedure: Civil* R 1357, p. 598, *et seq.*

## IV.

■ The question in the present case resolves itself into whether, in the light most favorable to the plaintiff, with every doubt resolved in her favor, it can be said beyond doubt she can prove no set of facts in support of her claim which would entitle her to relief. We answer in the negative and hold that the court erred in dismissing plaintiff's complaint on the basis of the pleadings alone.

The complaint presents an extremely important issue, novel in our jurisdiction, involving a constitutional right of the highest magnitude — an individual's right to privacy vis-a-vis the propriety of the police retaining that person's arrest records in police files after he had been acquitted of criminal conduct.

■ While recognizing this, defendants argue that no claim for relief has been stated because the regulation of use of arrest records is a matter for the legislature, which has not spoken on the subject. We agree that disposition of arrest records is subject to legislative control and we note that our legislature has dealt with the expungement problem in juvenile court proceedings. 1967 Perm. Supp., C.R.S. 1963, 22-1-11. However, this is not to say that, absent legislative action, judicial control may develop upon its facts to be an unconstitutional invasion of his right of privacy.

The record here is devoid of any facts showing the need of the police department to keep this plaintiff's arrest records, or the ability of the department to keep them confidential. Who has access to these records, what facts are contained in

them, how likely and to what extent information in the records may be disseminated, and what justification exists for their retention in the police files, are all questions, among many, which must be left to the trial court fact-finding process. After factual development, relief may or may not be warranted. Should the court determine the precise relief requested is not appropriate, other means may be formulated to protect plaintiff's right of privacy from any improper invasion. C.R.C.P. 54(c).

To hold that this case must be reversed and remanded for adjudication on the merits, however, is not to express an opinion as to what its eventual outcome should be. The issue presented is complex and involves the balancing of the state's interest in efficient law enforcement procedures as against a particular citizen's right to be let alone. Only after the facts are fully developed will this be possible.

The judgment is reversed and the cause remanded for further proceedings consonant with the views herein expressed.

MR. JUSTICE ERICKSON not participating.