**UNITED STATES of America, Plaintiff,**

v.

**Roberto BENLIZAR, Defendant.**

**Crim. No. 76–760.**

United States District Court,
District of Columbia.

Oct. 3, 1978.

Earl J. Silbert, U. S. Atty., William H. Collins, Jr., Roger M. Adelman, Asst. U. S. Attys., Washington, D. C., for plaintiff.

R. Kenly Webster, Washington, D. C., for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

This case is presently before the Court on the defendant's motion for the expungement of the record of his arrest and conviction. The defendant, a non-resident alien who has lived in the United States with his wife and child for many years, was convicted by a jury on April 5, 1977, of one count of distributing a controlled substance in violation of 21 U.S.C. § 841(a) (1970). On July 22, 1977, the defendant was sentenced by the Court to an indeterminate term under the Youth Correction Act, 18 U.S.C. § 5010(b) (1970). On February 16, 1978, the U.S. Court of Appeals for the District of Columbia in an unpublished opinion reversed and remanded the defendant's conviction after it became apparent that the government was guilty of violating the defendant's constitutional and statutory rights. 187 U.S.App.D.C. 240, 571 F.2d 674 (1978). These violations include the following incidents: first, a Drug Enforcement Administration (DEA) agent gave misleading testimony before this Court; second, the DEA failed for over six years to comply with the Court of Appeals' mandate in *United States v. Bryant,* 142 U.S.App.D.C. 132, 142, 439 F.2d 642, 652, *aff'd* 145 U.S. App.D.C. 259, 448 F.2d 1182 (1971) (per curiam), which required the promulgation of regulations to preserve discoverable evidence; and, third, DEA agents destroyed crucial evidence in this case.

The Court of Appeals, in reversing the defendant's conviction, remanded the case and ordered this Court to impose "appropriate additional sanctions based on all the circumstances of this case . . .." This case presents extreme violations by the government of the defendant's rights, despite prior explicit judicial admonitions to end such behavior. Furthermore, the defendant is facing an extraordinary degree of harm which will be inflicted upon him and his family by virtue of the record of arrest and illegal conviction. Accordingly, the defendant's motion to have the record of his arrest and conviction expunged is granted. These records and all writings or records pertaining thereto or arising out of same will be turned over to the clerk of this Court as hereinafter ordered.

## II. BACKGROUND

A. *A DEA Agent Violated The Defendant's Constitutional And Statutory Rights By Evading The Questions Of Counsel And The Court On The Existence Of Jencks Act[1] And Brady[2] Material.*

Defense counsel at trial moved for the production of all *Brady* and Jencks Act material. After no handwritten notes were turned over, the Court ordered an extensive *voir dire* on the existence of such notes. The Court explicitly asked whether the DEA agents had "made any handwritten notes of their conversations with the accused or anybody else in this case?" Tr. 185. The DEA agent in charge of the case testified on *voir dire* and failed to mention the critical notes which the Court of Appeals singled out in its decision as a basis of reversal and remand for the imposition of sanctions against the government.[3] The existence of these notes did not come to light until later in the trial, and the Court, relying on the earlier representations of this agent, mistakenly assumed that the notes referred to by the agent at trial were the same ones brought to the Court's attention during the *voir dire*.[4]

As will later be detailed, these notes were crucial to the defendant's case. The defendant's sole defense at trial was entrapment. Both sides admitted that the sale of the heroin by the defendant to the DEA agents was made by the defendant but orchestrated by the DEA paid confidential informer. This informer was present throughout the entire transaction, and provided the only government testimony at trial contradicting the defendant's defense. The only interview notes taken by the DEA agent who interviewed the informant concerning the events of the day of the sale were intentionally destroyed by the agent of the DEA.

B. *For Over Six Years The DEA Ignored The Mandate Of The Court Of Appeals In United States v. Bryant To Promulgate And Rigorously Enforce Rules Designed To Preserve All Discoverable Evidence.*

In 1970, the U.S. Court of Appeals for the District of Columbia held that "federal investigatory agencies must promulgate and rigorously enforce rules designed to preserve all discoverable evidence." *United States v. Bryant*, 145 U.S.App.D.C. at 260, 448 F.2d at 1183. In *United States v. Harrison*, 173 U.S.App.D.C. 260, 524 F.2d 421

---

1. The Jencks Act, 18 U.S.C. § 3500 (1970) was enacted in 1957. It governs the production of statements made to government agents by government witnesses. The enactment of the statute followed the Supreme Court's decision in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) which was an exercise of the Supreme Court's power to establish procedures for the administration of justice in the federal courts in the absence of statutory provision. The Court in *Jencks* held that a defendant in a federal criminal prosecution is entitled under certain circumstances, to obtain for impeachment purposes, statements which have been made to government agents by government witnesses. These statements are to be turned over to the defense at the time of cross-examination if their contents relate to the subject matter of the witnesses' direct testimony and if a demand for such statements has been made. The Jencks Act was drafted to clarify and delimit the reach of the *Jencks* decision. Essentially, the Act restricts the use of such statements to impeachment. *See Palermo v. United States,* 360 U.S. 343, 345–49, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

2. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."

3. The DEA agent testified on *voir dire* and did not mention that he made notes of his telephone interview with the informer concerning the events of the date of the alleged sale. Tr. 186–89. The Court of Appeals, in reversing and remanding the case, specifically pointed to the destruction of the notes of the conversation between the agent in charge of the investigation and the DEA informer. *United States v. Benlizar,* 187 U.S.App.D.C. 240, 571 F.2d 674 (1978).

4. During his testimony before the jury, the DEA agent in charge of the case admitted that he made such notes. Tr. 359–60.

(1975), a decision issued nine months before the transaction in this case, the same court stated, that "this court has several times had occasion to restate the importance of *Bryant,* especially as it applies to the preservation of rough interview notes." *Id.* 173 U.S.App.D.C. at 262, 524 F.2d at 423 n.1. The regulations called for in *Bryant* were not issued by the DEA until days before the destruction of the critical notes in this case and then, apparently, only in response to a recent Ninth Circuit decision which followed the *Bryant* decision of this Circuit.[5] In the opinion of this Court, the long-term refusal to comply with the Court of Appeals' order in *Bryant* was not only egregious conduct on the part of the government of the United States but was also in blatant disregard of the fundamental rights of the defendant in this case.

C. *Several DEA Agents Destroyed Discoverable Evidence In Violation Of Brady And The Jencks Act.*

Several DEA agents, including those who witnessed the transaction for which the defendant was tried, destroyed interview notes made in preparation of surveillance reports. Furthermore, photos used in a show-up in which the defendant was identified were destroyed.[6] In all, there were at least five incidents in which discoverable evidence was destroyed by DEA agents.[7]

Although defendant's motion to hold the DEA and one of its agents in contempt was denied, the Court is shocked and greatly displeased by the institutionalized and systematic refusal of this government agency and its agents to respect defendant's constitutional and statutory rights and one agent's apparent attempt to perpetrate a fraud upon this Court.

D. *Due To The DEA Agents' Violations Of The Law, The Defendant Did Not Receive A Fair Trial.*

In support of his entrapment defense, the defendant testified at trial. According to this testimony, he first met the DEA confidential paid informer about a month before the alleged sale occurred. Tr. 370–71, 390. Thereafter, the defendant and the informer played baseball together, and about two weeks later, the informant sought information from the defendant on where he could obtain narcotics. Tr. 371–72. About three weeks after meeting the informer and about four days before the alleged transaction, the informer, according to the defendant, pressed him further on buying drugs and asked the defendant to put up $500 to enable the informer to obtain heroin to sell. Tr. 404. The defendant claimed that he thought about it for a day and then asked a friend to lend him the $500 to give to the informer. Tr. 374, 400. The defendant stated that the informer was supposed to sell the drugs and that he gave the informer the borrowed $500 earlier in the day of the sale. Tr. 375–76, 421. The defendant testified that he put up the money with the understanding that he would have no role in acquiring, selling, or delivering the drugs. Tr. 421. According to the defendant, he saw the informer at the baseball field at 8:00 p. m. and asked the informer about his share of the proceeds from the supposed sale. Tr. 376. The informer told him at this time that he, as of yet, was unable to sell the drugs. Tr. 380. About an hour later he met the informer again and the informer told him that the man who was to take the drugs to the purchaser had not been located, and the informer

---

**5.** *United States v. Harris,* 543 F.2d 1247 (9th Cir. 1971). This decision was mentioned in the DEA regulations issued on October 28, 1976.

**6.** The Court granted the defendant's motion to suppress the identification of the photograph, thus this violation did not harm the defendant. However, it is further indication of the DEA's complete disrespect for the law.

**7.** Besides the photograph, the DEA agent in charge of the case destroyed notes made in preparation of the case file report, Tr. 186–89,

and destroyed notes of the phone conversation with the informer concerning the events of the date of the alleged sale. Tr. 359–60. The DEA agent who prepared the surveillance report destroyed handwritten notes on oral statements given to him by the DEA agent who allegedly purchased the narcotics from the defendant. Tr. 172, 189. The agent who prepared the report also destroyed drafts of this report. Tr. 183. An agent who witnessed the transaction destroyed handwritten notes used in preparation of the case file report. Tr. 189.

asked the defendant to accompany him to take the drugs with him to the purchaser to make the sale. Tr. 380. According to the defendant, the informer carried the drugs to the place where the sale was to occur and gave the defendant specific instructions on what to do, namely, who to hand the drugs to and how much money to request. Tr. 381. The defendant admitted following the informer's instructions. Tr. 212, 213, 381, 382, 384, 385, 438. The defendant testified that he gave the $2,000 that resulted from the sale to the informer, who split up the money by keeping $1200 himself. Tr. 439. Thus, the defendant admitted receiving $300 above the borrowed amount. Tr. 385–86. According to the defendant, two weeks later the informer asked the defendant to accompany him to another sale; this time the sale was to be for a quarter-pound of heroin, but the defendant refused. Tr. 387–88.

The informer's testimony at trial contradicted the defendant's testimony on the entrapment issue. He testified that he had been a paid confidential informer for the DEA for three years, and that he engaged in "buying heroin or you know making investigations about heroin, and introducing agents to people who sell heroin." Tr. 234–35. He received $1,700 for all the cases he made in Washington during the month and a half he was here during September and October 1976. Tr. 235, 253, 264–64. Essentially, the informer testified that the defendant suggested the sale and supplied the heroin. Tr. 246–48, 272.

Had the facts been as the defendant contended, rather than as the informer claims, the informer's role as an agent provocateur would make the defendant innocent of the crime charged because the defendant would have been entrapped. The U.S. Court of Appeals for the Third Circuit has forcefully made this point: "But when the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of the government has passed the point of toleration." *United States v. West*, 511 F.2d 1083, 1085 (3d Cir. 1975). The present Attorney General of the United States, while a Judge on the Fifth Circuit, indicated his agreement with this principle. *United States v. Mosely*, 496 F.2d 1012, 1015–16 (5th Cir.) (Bell, J.), *decision reaff'd and petition for rehearing denied*, 505 F.2d 1251 (5th Cir. 1974) (en banc).

This case involves a single sale to a narcotics undercover agent of less than an ounce of drugs containing 1.2 grams of heroin. The sale was arranged by a paid informer of the DEA. The defendant is not an addict, has no previous narcotics convictions, and was gainfully employed at the time of his arrest. The defendant's sole defense was entrapment. The critical points in the defendant's entrapment defense were contradicted at trial *only* by the testimony of the paid confidential informer. No other government witnesses testified on these points. A scenario could not be designed in which the issue of credibility could have been more critical to the jury's deliberations. The failure of the DEA agents to preserve the notes from interviews with the informer irreparably prejudiced the defendant's case. The defendant's conviction was overturned by the Court of Appeals because of these due process and statutory violations. The U.S. Attorney, perhaps sensing the weakness of the government's case,[8] declined to re-indict the defendant.

As a result of the strong factual showing of the defendant, and the exculpatory evidence which became available after the trial, there now exist serious doubts about the

---

8. After the trial ended, the defendant's counsel learned that the informer had arranged another sale with a different defendant to DEA agents. There are striking similarities in the facts of the two cases which tend to confirm the defendant's side of the story, especially the defendant's contention that the informer purchased the drugs and cut them with Sanka coffee to make two ounces of brownish heroin. Tr. 378. Both sales occurred on the same day, arranged by the same informer to DEA agents. The weight of the drugs in each case is approximately the same. (15.8 grams as compared to 16.1 grams). The percentage of heroin is approximately the same. (7.6% as compared to 8.2%). It seems highly unlikely to the Court that two separate defendants independently on the same day supplied such similar drugs to the DEA in a sale arranged by the same informer. The drugs in both cases must have come from a

government's ability to convict. Thus, there is a factual basis to support and reinforce the defendant's entrapment defense as well as the presumption of innocence accorded the defendant.

E. *The Continuing Harm To The Defendant Caused By The Record of Arrest And Conviction Is Of A Serious Nature.*

Courts, commentators, and state and federal legislators have become increasingly sensitive to the unjust harm that criminal records cause.[9] Although never found guilty of a crime, the constitutional benchmark to the infliction of punishment, a person who becomes entangled with the criminal justice system is forever unable to extricate himself even if completely exonerated. At one time courts were totally unbending in their approach to the issue of expungement,[10] however, changing notions of privacy,[11] along with the introduction of computerized information and storage and retriev-

single source. A reasonable conclusion is that the informer supplied the drugs to the defendants, thus the defendants were entrapped. The case involving the other defendant is *United States v. Gonzales*, Cr. 77–0089 (D.D.C.1977).

9. *See* Hess & LePoole, *Abuse of the Record of Arrest Not Leading to Conviction*, 13 *Crime & Delinquency* 494 (1967); Note, *Discrimination on the Basis of Arrest Records*, 54 Cornell L.Q. 470 (1971); Note, *Retention and Dissemination of Arrest Records: Judicial Response*, 38 U.Chi.L.Rev. 850 (1971) (hereinafter Note, *"Arrest Records"*); Note, *Maintenance and Dissemination of Records of Arrest Versus the Right of Privacy*, 17 Wayne L.Rev. 995 (1971); Note, *Discriminatory Hiring Practices Due to Arrest Records—Private Remedies*, 17 Vill.L. Rev. 110, 111–112 (1971); Comment, *The Right of Police to Retain Arrest Records*, 49 N.C.L. Rev. 509 (1971); Comment, *Criminal Law—Constitutional Law—The FBI's Right to Retain and Disseminate Arrest Records of Persons Not Convicted of a Crime May be Limited By the First and Fifth Amendments*, 46 N.Dame Law. 825 (1971); Comment, *Arrest Records—Protecting the Innocent*, 48 Tulane L.Rev. 629 (1974); Comment, *FBI Arrest Records: The Need to Control Dissemination*, 1970 Wash.U. L.Q. 530; Comment, *Arrest Record Expungement—A Function of the Criminal Court*, 1971 Utah L.Rev. 381.

Pursuant to the recommendation of the National Commission of Uniform State Laws in its Model Statute, the Uniform Controlled Substance Act, 36 states have enacted expungement statutes with respect to drug offenders. State expungement statutes are listed in Gough, *The Expungement of Adjudicative Records of Juvenile and Adult Offenders: The Problem of Status*, 1966 Wash.U.L.Q. 1, 162–68. This list was updated to 1971 by Note, *Arrest Records, supra* at 853 n.17. The state of Massachusetts refuses to participate in the FBI records system because that system records arrests even when no conviction has been entered. Time, July 23, 1973, at 14, *cited in Tarlton v. Saxbe*, 165 U.S.App.D.C. 293, 507 F.2d 1116 (1974).

On the federal level, the Youth Correction Act, 18 U.S.C. §§ 5005 *et seq.*, was enacted in 1950 with provisions for the expungement of conviction records. *See* 18 U.S.C § 5021; *Tatum v. United States*, 114 U.S.App.D.C. 49, 51, 310 F.2d 854, 856 n.2 (1962). On May 20, 1975, the Attorney General promulgated regulations which limit the dissemination of reported criminal activity. Section 20.32 of Title 20 C.F.R. provides that,

(a) Criminal history record information maintained in any Department of Justice criminal history record information system shall include serious and/or significant offenses.

(b) Excluded from such a system are arrests and court actions limited only to nonserious charges, e. g., drunkenness, vagrancy, disturbing the peace, curfew violation, loitering, false fire alarm, non-specific charges of suspicion or investigation, traffic violations (except data will be included on arrests for manslaughter, driving under the influence of drugs or liquor, and hit and run). Offenses committed by juvenile offenders shall also be excluded unless a juvenile offender is tried in court as an adult.

10. *See e. g., State ex rel. Mavity v. Tyndall*, 224 Ind. 364, 66 N.E.2d 755 (1946); *State ex rel. Reed v. Harris*, 348 Mo. 426, 153 S.W.2d 834 (1941).

11. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Davidson v. Dill*, 180 Colo. 123, 503 P.2d 157, 158 (1972); Countryman, *The Diminishing Right of Privacy: The Dossier and the Computer*, 49 Tex.L.Rev. 837 (1971); Note, *Arrest Records, supra* note 8, at 852 & n.10; *But see Paul v. Davis*, 424 U.S. 639, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

al systems [12] have transformed the nature of the harm inflicted by criminal records and has led to increasing sensitivity to the problems of the exonerated yet punished defendant.

The magnitude of the problem of criminal records will not permit it to be ignored. A government study has indicated that "about 50% of the male children living in the United States today will be arrested for a nontraffic offense sometime in their lives." [13] This statistic in light of the fact that arrests fall more heavily on the young and members of minority groups who have traditionally faced difficulty in obtaining credit, insurance, employment, and justice in the courts, augments the hardship and unacceptability of present practices.

The disabilities flowing from a record of arrest have been judicially recognized. First, there is serious harm to a person's reputation, psychological health, and ability to obtain employment, insurance, credit, and entry into various professions. [14] Although the concern has at times been expressed as pertaining to the "injury to the reputation of the individual if [records are] allowed to fall into the wrong hands," *United States v. Dooley*, 364 F.Supp. 75, 78 (E.D.Pa.1973), it is not merely a matter of

"falling" into the wrong hands. Although supposedly confidential, it is a well known fact that such records are disseminated to virtually anyone. [15] Furthermore, regulations of the Attorney General allow dissemination to government agencies, railroad police, insurance companies, and most banks. [16] An example of the dissemination of arrest records can be found in *Menard v. Saxbe*, 162 U.S.App.D.C. 284, 291, 498 F.2d 1017, 1124 (1974), in which the arrest records involved in that case had been furnished to the United States Marine Corps and the National Agency Check Centers.

The effect of arrest records on one's ability to find a job has been recognized and documented. In *Kowall v. United States*, Chief Judge Fox observed that "economic losses themselves may be both direct and serious. Opportunities for schooling, employment, for professional licenses may be restricted or nonexistent as a consequence of the mere fact of arrest, even if followed by acquittal or complete exoneration of the charges involved." In support of this statement, Chief Judge Fox cites a survey by the New York Civil Liberties Union indicating that 75 per cent of New York area employment agencies would not accept for referral an applicant with an arrest record, [17] and

12. *Davidson v. Dill, supra* at 158; Countryman, *supra* note 11; Note, *Arrest Records, supra* note 8, at 852 & n.10.

13. President's Comm'n on Law Enforcement and Administration of Justice, Report: *The Challenge of Crime in a Free Society* 247 (1967) *cited in* Note, *Arrest Records, supra* note 11, at 851 n.15.

14. *See Menard v. Saxbe*, 162 U.S.App.D.C. 284, 291, 498 F.2d 1017, 1024 (1974); *Kowall v. United States*, 53 F.R.D. 211 at 214–15; *United States v. Hudson*, Crim. No. 49590–74 (D.C. Super.1976) (Greene, J., now of this Bench); *Commonwealth v. Malone*, 244 Pa.Super. 62, 366 A.2d 584, 588 (1976).

15. Note, *Arrest Records, supra* note 11, at 852–53 § n.12. The District of Columbia has restricted the dissemination of records not leading to conviction. The so-called "Duncan Report," which was included as an appendix to *Morrow v. District of Columbia*, 135 U.S.App. D.C. 160, 417 F.2d 728 (1969), recommended that dissemination of arrest records in which there had been no conviction or forfeiture of

collateral be limited to "law enforcement agents" for "law enforcement purposes." These recommendations were eventually enacted by the District. Note *Arrest Records, supra* at 866–67. In *Menard v. Mitchell (II)*, 328 F.Supp. 718, 725–28 (D.D.C.1971), *rev'd on other grounds*, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974), the dissemination of arrest and conviction records were limited on statutory grounds. Congress in part reversed this limitation when it authorized dissemination to certain banking institutions and agencies. Pub.L. 92–184, 85 Stat. 642 § 902; *see* 28 C.F.R. 40.-85(b) (1977).

16. *Id.*

17. E. Sparer, *Employability and the Juvenile "Arrest" Record* (unpublished study by the N.Y.U. Center for the Study of Unemployed Youth (1966)), *cited in* Note, *Arrest Records, supra* note 11, at 864 n.79. In another study cited in Note, *Arrest Records, supra* at 864 n.79, two-thirds of the employers surveyed would not consider employing a man acquitted of assault charges. Schwartz & Skolnich, *Two*

another study in which 66 of the 75 employees interviewed indicated that they would not hire a man who was arrested for assault and battery.[18] As pointed out in *Kowall*, an arrest record at least encourages an employer to further investigate, and if it is convenient to fill the space before the investigation can be completed, the arrested person will not be able to obtain the job. 53 F.R.D. at 215 n.17 *citing* Hess & LePoole, *supra* note 11, at 496. The arrested individual will most likely not be given the opportunity to explain away the arrest.[19]

Second, an arrested individual is also burdened with regard to any future interactions with the law enforcement system. One with a record will be the first suspected and the last eliminated whenever a crime has occurred. *Davidson v. Dill*, 180 Colo. 123, 503 P.2d 157, 159 (1972). Prosecutors use arrest records to determine whether to formally charge an accused. *Id.* An arrest can serve as a basis for denying release prior to trial or appeal, *Menard v. Mitchell*, 139 U.S.App.D.C. 113, 430 F.2d 486, 491 (1970), and may be considered by the Judge in sentencing.[20] An arrest record will interfere with a defendant's ability to testify at trial. *See United States v. Hudson, supra* at 11. And, if the arrested person is subsequently sent to jail an arrest

record will influence the parole board in its decision whether or not to grant parole. *Id.*

This harm to arrested people is most difficult to square with a fundamental maxim upon which our criminal justice system operates, namely that every accused is presumed innocent. Moreover, the present state of affairs with regard to arrest records breeds cynicism and contempt for our American system of justice, and contributes to the high rate of recidivism and crime in general.

This case presents *an additional factor*. The defendant in this case is a resident alien who has lived in the United States since he was ten years old. Under 8 U.S.C. § 1182(a)(23) any alien whom the consular officer believes is or has been an illicit trafficker in drugs is ineligible to receive a visa and is excluded from entering the United States. Although the defendant is in the United States at the present time, if he should ever leave this country and want to return, his arrest record would enable the consular officer in an exclusionary proceeding to prevent him from re-entering the United States, without, under present law, permitting the courts to review this determination.[21] If the defendant should ever travel internationally,[22] he could be

*Studies of Legal Stigma*, 10 Social Prob. 133, 136 (1962).

**18.** *Kowall v. United States, supra* at 215 n.17.

**19.** *United States v. Dooley*, 364 F.Supp. 75, 77 (E.D.Pa.1973)
"a collection of dismissed, abandoned or withdrawn arrest records are no more than gutter rumors when measured against any standards of constitutional fairness to an individual and, along with records resulting in an acquittal are not entitled to any legitimate law enforcement credibility whatsoever."

**20.** *Menard v. Saxbe*, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974) (record of arrests may be used to determine whether appellant may be released pending appeal); *United States v. Cifarelli*, 401 F.2d 512 (2nd Cir.) *cert. denied*, 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448 (1968) (in imposing sentence, the trial judge may consider evidence of other crimes for which the defendant was not convicted); *Jones v. United States*, 113 U.S.App.D.C. 233, 307 F.2d 190 (1962), *cert. denied*, 372 U.S. 919, 83 S.Ct. 733, 9

L.Ed.2d 724 (1963) (pre-sentence report may include, and the judge may consider, records of charges not leading to conviction); 23 D.C. Code § 1321(b) (permits judicial officer, in determining the conditions of pre-trial release, to take into account defendant's "past conduct, . . . record of convictions, and any record of appearance at court proceedings").

**21.** *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Pena v. Kissinger*, 409 F.Supp. 1182 (S.D.N.Y.1976); Note, *Judicial Review of Visa Denials: Reexamining Consular Nonreviewability*, 52 N.Y.U.L.Rev. 1137 (1977).

**22.** *Cf. Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (members of the communist party successfully challenged statute denying them opportunity to obtain passports on ground of fifth amendment due process clause includes freedom of international travel).

refused re-entry, and thus be deprived of "both property and life, or all that makes life worth living." *Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922) (Brandeis, J.).

The arrest and illegal conviction record would also interfere with the defendant's ability to become a citizen. In order for an alien to become a United States citizen, he must demonstrate good moral character.[23] Although some general standards are provided in the statute, the determination is still made on a case-by-case basis,[24] and an arrest would adversely influence that determination.[25]

The flagrant illegal activity of the government in this case along with the past and prospective harm and denial of fundamental freedom to the defendant has led the Court to carefully examine the relevant precedents in order to do justice in this case which involves what has been recognized as a "particularly sensitive area of law, concerning the developing relationship between values of individual privacy and the record-keeping functions of the executive branch." *Tarlton v. Saxbe,* 165 U.S.App.D.C. 293, 298, 507 F.2d 1116, 1121 (1974).

**23.** 8 U.S.C. § 1427(a) (1970); *see* 3 Gordon & Rosenfield, Immigration Law & Procedure § 15.15 (1977).

**24.** Gordon & Rosenfield, *supra* note 23, at 15–43—15–44. *See also* Comment, *Immigration Law—National Standard, Incorporation of State Law or Hybrid Test—State Definition of Adultery Utilized for Determining "Good Moral Character" in a Voluntary Departure Proceeding—Brea-Garcia v. Immigration & Naturalization Service,* 51 N.Y.U.L.Rev. 1021, 1025, 1033–35 (1976).

**25.** The government contends that expungement of the record of defendant's arrest and conviction will have no effect whatsoever on the defendant's ability to re-enter the United States after travel abroad or ability to become a citizen. Although the precise question is not before the Court at this time, the Court would like to point out that the law in this area is not as settled as the government has claimed. First, the government points out that the defendant, to become a citizen or re-enter the country, will be required to detail all his arrests, expunged or

## III.

## THE COURTS HAVE A DUTY TO REDRESS AN INJURY AND HAVE THE INHERENT POWER TO EXPUNGE CRIMINAL RECORDS NOTWITHSTANDING STATUTES REQUIRING THEIR ACQUISITION AND RETENTION

The Attorney General of the United States is required by 28 U.S.C. § 534(a) (1970) to acquire, retain, and disseminate criminal records. No federal statute provides for the expungement of arrest records. *United States v. Schnitzer,* 567 F.2d 536 at 597. However, despite this statutory scheme courts have recognized the inherent power which lies within the court's sound discretion to order the expungement of criminal records. *Kowall v. United States,* 53 F.R.D. 211 (W.D.Mich.1971), contains one of the more complete discussions of the effect of such statutes on the contours of the court's power to expunge. First, the court noted that any challenge to the inherent power of a federal court to enter an order expunging arrest records is foreclosed by prior decisions. *Kowall v. United States, supra* at 213, *citing United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967); *Hughes v. Rizzo,* 282 F.Supp. 881 (E.D.Pa.

not. However, it has been held that once criminal records are expunged they are set aside for all purposes and the defendant cannot be punished for a response to a questionnaire that fails to reveal the expunged record. See *United States v. Fryer,* 402 F.Supp. 831, 835 (N.D.Ohio 1975) (defendant could not be found guilty for failing to mention conviction that had been expunged in an application for a firearm permit.) Also, the government claims that it may consider the defendant's arrest and trial despite the expungement of the record to determine if the defendant is a known trafficker in narcotics. No court, to the knowledge of this Court, has as of yet ruled on this question. In a closely analogous area—the effect of expungement of a conviction on the government's ability to deport for convictions—the courts have split on the question of whether an expungement prevents the use of the conviction in a deportation proceeding. *See* Note, *The Impact of Expungement Relief on Deportation of Aliens for Narcotics Convictions.* 65 Geo.L.J. 1325 (1977).

1968); *Wheeler v. Goodman,* 306 F.Supp. 58 (W.D.N.C.1969); *United States v. Kalish,* 271 F.Supp. 968 (D.P.R.1967); *see Menard v. Saxbe,* 162 U.S.App.D.C. 284, 498 F.2d 1017, 1023 (1974).

In addition to the authority of prior rulings, the Court in *Kowall* relied on "the natural law of remedies" which "does not set arbitrary limits on a federal court's jurisdiction to right wrongs cognizable by the common law within the jurisdiction of the court." *Kowall v. United States, supra* at 213. In support of its jurisprudential justification for its power, the court quoted Mr. Justice John Marshall in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60: "The very essence of civil liberty certainly consists in the rights of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." The rationale behind all expungement decision, as expressed by Judge Wisdom, to a great extent explains the foundation underlying the power:

> in order to grant full relief in this case, we must see that as far as possible the persons who were arrested and prosecuted . . . are placed in the position in which they would have stood had the county not acted unlawfully. . . . Of course no court order can completely eradicate the effect of the country's [*sic*] actions. . . . The Court can and must, however, do all within its power to eradicate the effect of the unlawful prosecutions in this case.

*United States v. McLeod,* 385 F.2d 734, 749–50 (5th Cir. 1976).

Statutes requiring the maintenance, acquisition, and dissemination of criminal records have not eradicated the equitable remedy of expungement. The government agents in this case injured the defendant and the law provides a remedy.

 A request for expungement must be examined on its merits to determine the proper balancing of the equities. The decision to expunge a record must be based on the facts and circumstances in each case. *United States v. Schnitzer,* 567 F.2d at 599

(2d Cir. Nov. 30, 1977); *United States v. Bohr,* 406 F.Supp. 1218, 1219 (E.D.Wis. 1976); *United States v. Seasholtz,* 376 F.Supp. 1288, 1298 (N.D.Okl.1976); *United States v. Rosen,* 343 F.Supp. 804, 809 (S.D.N.Y.1972); *Kowall v. United States, supra* at 214; *United States v. Kalish, supra* at 968; *Doe v. Commander,* 273 Md. 262, 329 A.2d 35, 44 (1974); *Davidson v. Dill,* 180 Colo. 123, 503 P.2d 157 (1972); *In re R.L.F.,* 256 N.W.2d 803 (Minn.1977); *Gay v. United States,* 259 A.2d 593 (D.C.App.1969); *Commonwealth v. Malone,* 244 Pa.Super. 62, 366 A.2d 584, 589 (1976); *see Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 58, 478 F.2d 938, 968 (1973) ("The principle is well established that a court may order the expungement of records, including arrest records, when that remedy is necessary and appropriate in order to preserve basic legal rights.").

IV.

## THE RECORD OF THE DEFENDANT'S ILLEGAL CONVICTION SHALL BE EXPUNGED BECAUSE OF THE SERIOUS INTENTIONAL UNCONSTITUTIONAL ACTIONS OF THE GOVERNMENT IN THIS CASE

Record keepers are required to indicate the subsequent disposition of arrests and convictions. *Tarlton v. Saxbe,* 165 U.S.App. D.C. 293, 507 F.2d 1116 (1974); *Shadd v. United States,* 389 F.Supp. 721 (W.D.Pa. 1975). If the record of the defendant's conviction indicates that it has been overturned, the damage to the defendant will be somewhat assuaged. However, the public, including employers, insurers and lenders, will not be able to appreciate the reason for reversal. The public may feel the defendant was freed on the basis of a "legal technicality" and is "guilty" of the offense for which he was convicted. Other courts have recognized the inadequacy of merely indicating that an illegal conviction has been overturned.

In *Grandison v. Warden,* 423 F.Supp. 112, 116 (D.Md.1976), the court observed that "(c)learly, a notation that the conviction has been vacated would not be effective to

erase the impact of the conviction itself." The court proceeded to order the record expunged "so that no trace of his void convictions remains." *Id.*

In *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967), Judge Wisdom ordered the expungement of records of convictions when they were obtained for unconstitutional purposes. *See also Kowall v. United States,* 53 F.R.D. 211 (W.D.Mich.1971) (illegal conviction record expunged).

■ As detailed earlier in this opinion, the defendant's conviction was overturned after it became apparent that the government had destroyed evidence, misled this Court, and for six years ignored an order of this circuit's court of appeals. The Court feels that the effects of the illegal conviction should be as far as possible completely eradicated. There is another reason that expungement of the record of defendant's conviction is appropriate in this case. As mentioned earlier, this Court sentenced the defendant under the Youth Correction Act, 18 U.S.C. § 5021 (1970). Under this act the defendant could have been eligible to have his conviction, had it been valid, expunged. *See Tatum v. United States,* 114 U.S.App. D.C. 49, 51, 310 F.2d 584, 856 n.2 (1962). It would be anomalous indeed, if a valid conviction would be expungable, whereas an unconstitutional conviction would endure to haunt the defendant.

Therefore, the Court orders the government to turn over all records of the defendant's conviction to the clerk of this Court as specified in the order issued of even date herewith.

## V.

### THE ARREST RECORD ALSO SHOULD BE EXPUNGED BECAUSE THE COURT FINDS THAT UNDER THE CIRCUMSTANCES OF THIS CASE THE ARREST WAS DEFECTIVE

A. *Where An Arrest Is Defective Expungement Of The Arrest Record Is Readily Granted.*

There are numerous cases in which individuals arrested without probable cause have had their arrest records expunged. E. g. *Menard v. Saxbe,* 162 U.S.App.D.C. at 292, 498 F.2d, *supra* at 1025; *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938 (1973); *Urban v. Breir,* 401 F.Supp. 706 (E.D.Wis.1975); *Washington Mobilization Committee v. Cullinane,* 400 F.Supp. 186, 217 (D.D.C.1975) *aff'd in part and rev'd in part,* 184 U.S.App.D.C. 215, 566 F.2d 107 (1977); *Hughes v. Rizzo,* 282 F.Supp. 881 (E.D.Pa.1968).

■ A lack of probable cause is not the only defect that constitutes a sufficient rationale to expunge an arrest record. A logical relationship between the injury and the requested remedy is what is necessary in all expungement cases. *See United States v. McLeod,* 385 F.2d 734, 749–50 (5th Cir. 1967). Of course, just because a defendant is not convicted is not sufficient reason to expunge the arrest record because it remains a defect-less historical fact. *See United States v. Schnitzer,* 567 F.2d 536 (2nd Cir. 1977); *Coleman v. United States Department of Justice,* 429 F.Supp. 411, 413 (N.D.Ind.1977); *United States v. Seasholtz,* 376 F.Supp. 1288, 1289 (N.D.Okl.1976); *Hammons v. Scott,* 423 F.Supp. 625, 626 (N.D.Cal.1976); *Shadd v. United States,* 389 F.Supp. 721, 722 (W.D.Pa.1975); *United States v. Dooley,* 364 F.Supp. 75, 78 (E.D. Pa.1973); *United States v. Rosen,* 343 F.Supp. 804, 809 (S.D.N.Y.1972); *Matter of Alexander,* 259 A.2d 592, 593 (D.C.App. 1969).

■ In cases in which special circumstances are presented such as the special injury to the defendant along with the reprehensible government conduct in this case, an arrest can be expunged when illegal government behavior taints the validity of the arrest. There are many cases illustrating this principle in which arrest records have been expunged notwithstanding a probable cause basis for the arrest when the arrest is for some other reason defective. *United States v. McLeod,* 385 F.2d 734 (5th Cir. 1967) (arrests were carried out in order to intimidate black citizens in their attempts to encourage others to vote); *Ko-*

wall v. United States, 53 F.R.D. 211 (W.D. Mich.1971) (arrest for failure to report for induction based on statute later declared unconstitutional); *United States v. Kalish,* 271 F.Supp. 968 (D.P.R.1967) (arrest for refusal to step forward to report for induction into the armed forces based on the advice of counsel); *United States v. Jones,* Crim. No. 36388–69 (D.C.Ct.Gen.Sess., 1970) (mistaken identity); *United States v. Hudson,* Crim. No. 49590–74 (D.C.Super.1978) (arrest for murder—later coroner determined that cause of death was suicide); *Wheeler v. Goodman,* 306 F.Supp. 58 (W.D.N.C.1969) (police misuse); *United States v. Bohr,* 406 F.Supp. 1218 (W.D.Wis.1976) (arrest on basis of Grand Jury indictment for use of mails with intent to defraud source of embarrassment to attorney's reputation); *Grandison v. Warden,* 423 F.Supp. 112 (D.Md.1976) (youth wrongly tried as an adult).

As set out earlier in this opinion, massive and serious violations of the law by the DEA and its agents hindered the defendant's ability to affirmatively demonstrate that he had been entrapped. Under these extreme circumstances, including the strong factual showing made by the defendant, it is fair and just, for the limited purpose of deciding whether the defendant's record should be expunged, for the Court to assume that had the defendant received a fair trial he would have established entrapment and would have been exonerated.

■ One entrapped into criminal behavior has suffered a defective arrest in the same sense that one arrested without probable cause, based on an unconstitutional statute, because of mistaken identity, or the product of harassment has suffered a defective arrest. An entrapped defendant would have a stronger case for expungement than the defendant in *Menard v. Saxbe,* 162 U.S. App.D.C. 284, 291, 498 F.2d 1017, 1024 (1974). In *Menard,* the defendant, a young man, was arrested while sleeping in the middle of the night on a park bench. The police were called to the scene after the defendant was seen peeking through the windows of an old age home and the offi-

cers, as they approached the defendant, found a wallet not belonging to the defendant, near the bench where he was found sleeping. The U.S. Court of Appeals for the District of Columbia ordered the record expunged after the defendant could not be connected with any crime despite the circumstances apparent at his arrest. An entrapped individual, also could not be connected with any crime despite the circumstances apparent at his arrest. Thus, he would have suffered a defective arrest and therefore there is ample authority to order the records of an entrapped individual expunged. This conclusion is enforced by the realization that entrapment has an added element not present in cases like *Menard,* namely, that entrapment always encompasses the added factor of government misbehavior which is inextricably involved in this case.

**[10, 11]** In deciding whether a record of arrest is to be expunged, the Court must balance the harm to the defendant of the retention of the records as compared to the needs of the government for the records. *United States v. Schnitzer, supra* at 599; *United States v. Kowall, supra* at 214; *United States v. Bohr,* 406 F.Supp. 1218, 1219–20 (E.D.Wis.1976). In this case, the records could cause the defendant to be excluded from citizenship and force him to be separated from his wife and child along with the continuing harm to his ability to find work, credit, etc. He has already spent months in jail for a conviction that was overturned. Any further harm is intolerable. The government's need for maintaining these records should not be exaggerated. Recent statutory enactments by both the states and the federal government have restricted the maintenance and dissemination of records. *See* note 8 *supra.* On balance, justice and fairness in this particular case require that the arrest record be expunged. The same order with regard to the record of conviction shall be applied to the arrest record.

An order in accordance with the foregoing will be issued of even date herewith.