720 A.2d 934

**Oscar MORA**

v.

**STATE of Maryland.**

**No. 1708, Sept. Term., 1997.**

Court of Special Appeals of Maryland.

Nov. 25, 1998.

700

Sterling Mead, Law Student pursuant to Rule 16 (Stephen E.. Harris, Public Defender and Michael R. Malloy, Asst. Public Defender, on the brief), Baltimore, for Appellant.

Regina Hollins Lewis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen, Baltimore, and Frank Weathersbee, State's Atty. for Ann Arundel County, Annapolis, on the brief), for Appellee.

Before DAVIS and ADKINS, JJ., and MARVIN H. SMITH, Judge (Retired, Specially Assigned).

ADKINS, Judge.

Oscar Mora, appellant, was convicted by a jury in the Circuit Court for Anne Arundel County (Lerner, J.), of two counts of maintaining a common nuisance. Judge Lerner sentenced Mora to two concurrent twenty year sentences with all but fifteen years suspended, followed by five years of probation. In addition, the court imposed fines totaling $50,-000.00 on Mora. Mora filed an appeal, and by an order dated December 11, 1997, a three-judge sentence review panel struck one of the concurrent twenty year sentences with all but fifteen years suspended and also struck one of the $25,-000.00 fines.

Mora asks us to decide whether the lower court erred in denying his related motions to dismiss the case and to exclude evidence on grounds that he had obtained judicial expungement of the records in three prior criminal cases against him involving the same facts. In addition, Mora presents us with the question of whether the lower court erred by denying his motion for a mistrial and other relief because the State refused to provide current addresses and telephone numbers of key prosecution witnesses. Last, Mora asks us to examine whether the evidence was sufficient to support the convictions.

We find no reversible error and affirm the judgment of the circuit court.

## FACTS AND LEGAL BACKGROUND

Mora was charged with two counts of maintaining a common nuisance pursuant to Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 286(a)(5), in Anne Arundel County, Maryland. Mora filed

pre-trial motions for dismissal and exclusion of evidence, including a motion *in limine* for the exclusion from evidence of certain documents and papers that he contended were subject to expungement orders previously granted by a Maryland district court judge pursuant to Md.Code (1957, 1996 Repl.Vol. & 1997 Supp.), Art. 27 § 737. The court denied the motion as to a substantial portion of the records at issue.

All of the events involving the sale or possession of CDS, which formed the basis for the charge of maintaining a common nuisance in this case, were also the subject of previous charges against Mora in the District Court of Maryland for Anne Arundel County, that were dismissed, and subsequently expunged pursuant to Md.Code (1957, 1996 Repl.Vol. & 1997 Supp.), Art. 27 §§ 735–741. Although the record and briefs are unclear, it appears that these dismissals were by entry of *nolle prosequi*.[1] The specific evidence will be detailed below.

At trial, the prosecution presented testimony from witnesses who sold cocaine for Mora on a property known as "the compound" at which Mora resided. The compound was owned by Mora's father-in-law, and several buildings were located on this property. These included the house in which Mora and his wife lived, a shop, a garage, and a game room. The witnesses explained that they would usually sit at the gate of the compound, and various persons would arrive, seeking to purchase cocaine. The witnesses testified that they would then go back to Mora's office in the compound and give him money or goods[2] offered by the purchaser in trade. Mora

---

1. The parties say that the previous cases were "dismissed." There is no contention by Mora that they were dismissed with prejudice or that double jeopardy applies. For this reason, we assume that a *nolle prosequi* was entered in each of these prior cases. We also note that Mora was able to obtain expungement on an expedited basis (*i.e.* prior to the expiration of three years from the entry of the *nolle prosequi*) under Art. 27 § 737(d)(2)(i)(1) by executing a general release of all tort claims arising from the charge.

2. Examples of these goods were cigarettes, beer, VCRs, televisions, and jewelry.

would then give the witness cocaine for the customer, which the witness would take to the compound gate and deliver to the customer. Customers would come to the gate both in cars and on foot.

One witness, Ms. Romano, estimated that she collected anywhere from $300 to $1,000 during a "shift" at the gate. Another witness, Mr. Woods, estimated he collected $300 to $5,000 per day while at the gate. These witnesses testified that between fifteen and forty customers a day would come to the gate to make a purchase.

The witnesses who sold CDS for Mora were generally paid for their services with cocaine, but some of them were occasionally paid in cash. They were paid by Mora. In addition to the witnesses who sold CDS for Mora, another witness, Ms. Moore, testified that she purchased cocaine from the compound, and one time, directly from Mora. Police personnel also testified about their knowledge of drug activity by Mora, including the execution of several search warrants described below.

Detective McAndrew testified that during April and May of 1993, he initiated an investigation into the illegal drug activities of Mora. As a result of the investigation, he obtained a search warrant on May 3, 1993. He testified that during the execution of that search warrant on May 16, 1993, he located Mora and searched him. McAndrew explained that he seized $1,440 from Mora and the serial numbers of that money matched the serial numbers of money the detective had given an informant earlier that day to purchase cocaine from Mora. He testified that no drugs or guns were found on the premises.

Sergeant McCullen testified that on April 15, 1994, he responded to the Amtrak train station in Linthicum, Maryland, and located two males carrying a bag. He approached them, identified himself, and obtained consent to search their bags and belongings. McCullen testified that he searched them and found a card with Oscar and Lora Mora's names and address on it and $9,860 in a brown paper bag.

Detective McLaughlin testified that investigations were continuing on February 23, 1995, when he met two individuals at a bar in Severn, from whom he had arranged, through a confidential informant, to purchase cocaine. He testified that he received crack cocaine from one of them. Officer Birdsell and Sergeant Wilson both testified that they accompanied the detective as a backup unit and provided surveillance. Detective McLaughlin then testified that on March 10, 1995, he purchased another eighth ounce of crack cocaine from the same individual and detailed numerous periods of surveillance conducted outside Mora's residence. Based on these investigations, he obtained a search warrant for Mora's residence that he and Officer Burns executed on August 6, 1995. Inside the residence, Detective McLaughlin found suspected narcotics and paraphernalia. Officer Burns testified that he was part of the entry team and had secured Mora upon entering the residence. He also testified that he searched Mora prior to transporting him for processing and found $405.69 in his left front pants pocket.[3]

On September 26, 1996, a second search warrant was executed for Mora's premises, this time by Detective Russell. He testified that during the execution of that warrant, he located three individuals in an automobile and found narcotics paraphernalia on them.[4] He executed a third search warrant at Mora's residence on November 16, 1996, where he located several types of narcotics paraphernalia. Officer Mangold assisted in this search and testified that the forty dollars she had given to a confidential informant for the purpose of

---

**3.** The police investigations described thus far culminated in charges being brought against Mora in August 1995, in the District Court of Maryland for Anne Arundel County, case no. 4A0148, alleging that Mora maintained a common nuisance, manufactured CDS, possessed CDS, and conducted cockfights. As indicated earlier, it appears that a *nolle prosequi* was entered as to these charges, and the records were subsequently expunged.

**4.** This investigation resulted in a second case brought against Mora in the District Court of Maryland for Anne Arundel County, case no. 5A25884, alleging that he maintained a common nuisance, which was also dismissed, and then expunged.

purchasing cocaine earlier that day was recovered from Mora's pocket.[5]

After this evidence, the prosecution rested its case and defendant's motion for judgment of acquittal was denied.

The defense called one witness, Mora's wife, Lora Mora, who testified that she controlled the property. She testified that the property belonged to her father. The defense rested its case and moved, once again, for a judgment of acquittal. The motion was denied.

Additional facts will be added as they are necessary to our discussion of the questions presented.

## DISCUSSION

### I.

### EXPUNGEMENT

Appellant contends that the lower court erred in denying his pre-trial motion to dismiss and his motion *in limine*. Both motions were based upon Mora's contention that the police reports, search warrants, affidavits, and inventory reports, relied upon by the police in the investigations of this case, were all developed by the police in connection with the three district court cases that had been expunged pursuant to Md.Code (1957, 1996 Repl.Vol. & 1997 Supp.), Art. 27 §§ 735–741. Mora contends that any testimony about these records or the searches to which they pertain, and any evidence seized during such searches was inadmissible. Mora further asserts that a prosecution based upon these records was highly prejudicial and deprived him of a fair trial. Specifically, Mora criticizes the prosecution for not going forward with the dismissed cases at the time charges were brought, and con-

---

**5.** This search resulted in charges against Mora for maintaining a common nuisance brought on November 17, 1996, case no. 5A30455 in the District Court of Maryland for Anne Arundel County. These charges were the third set of charges that were dismissed and subsequently expunged.

tends it is an "abuse of process" for the State to seek an indictment after those cases were expunged.

The State counters that Maryland's expungement statute only requires expungement of "court records" and "police records," and expressly exempts from expungement all police "investigatory files" and "police work-product records used solely for police investigation purposes. . . ." *Id.* at § 735(e). The State contends that the materials that were developed by the police in connection with the previously dismissed district court cases constitute police "investigatory files" or "work-product" under section 735(e), and are thus not subject to expungement.[6] Neither this Court nor the Court of Appeals has had occasion to examine this specific exemption provided in section 735(e).

Our first step in examining this exemption is to look to the definitions of "expungement," "court records," and "police records" provided in section 735. "Expungement" is defined,

with respect to court records or police records, [as] the effective removal of these records from public inspection:

(1) By obliteration;

(2) By removal to a separate secure area to which the public and other persons having no legitimate reason for being there are denied access; or

(3) If effective access to a record can be obtained only by reference to other records, by the expungement of the other records, or the part of them providing access.

Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 735(c). The term "court records" is defined as:

all official records maintained by the clerk of a court or other court personnel pertaining to a criminal proceeding. It includes indices, docket entries, charging documents,

---

6. It is undisputed that the expungement orders were properly granted in the three district court cases pursuant to section 737.

pleadings, memoranda, transcriptions of proceedings, electronic recordings, orders, judgments, and decrees.

*Id.* at § 735(b).[7] The term "police records" is defined as:

all official records maintained by a law enforcement agency or the Central Repository pertaining to the arrest and detention of or further proceeding against a person on a criminal charge or for a suspected violation of a criminal law. *It does not include investigatory files, police work-product records used solely for police investigation purposes* . . . .

*Id.* at § 735(e) (emphasis added).

Preliminary to our interpretation of these sections of the expungement statute, we refer briefly to the principles of statutory construction. The Court of Appeals in *Mazor v. Department of Correction,* 279 Md. 355, 369 A.2d 82 (1977), listed the principal guidelines of statutory interpretation:

[T]he cardinal rule of construction of a statute is to ascertain and carry out the real intention of the Legislature. The primary source from which we glean this intention is the language of the statute itself. And in construing a statute we accord the words their ordinary and natural signification. If reasonably possible, a statute is to be read so that no word, phrase, clause or sentence is rendered surplusage or meaningless. Similarly, wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences. Moreover, if the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature.

*Id.* at 360–61, 369 A.2d 82 (citations omitted).

The specific language in the expungement statute that draws our focus is the exception to the definition of police records in section 735(e), which excludes from its scope "investigatory files, [and] police work-product records used solely for

---

7. Section 735(b) also contains language excluding from "court records" certain types of records that are not pertinent to this appeal.

police investigation purposes." The legislature did not offer a more specific definition of "investigatory files." Nor is the term "police work-product" defined in the statute. Thus, to determine the meaning of these exceptions, it will be necessary to examine the purpose behind the expungement statute, as well as the meaning of other terms contained in the overall statutory scheme. *See Barr v. Barberry Bros.*, 99 Md.App. 33, 38–39, 635 A.2d 64 (1994).

### Purpose of Expungement Statute

We have found no legislative history pertaining to this statute, which was enacted in 1975. A Court of Appeals decision, decided in the year *prior* to the statute's enactment, is instructive as to the likely legislative intent. In *Doe v. Wheaton Police Dept.*, 273 Md. 262, 329 A.2d 35 (1974), the Court of Appeals considered a petition for expungement filed after the State entered a *nolle prosequi* to charges against the petitioner alleging unnatural and perverted sexual acts. As Maryland had no applicable expungement statute at that time,[8] the petitioner sought expungement based on a claimed right of privacy grounded upon constitutional and common law legal decisions. The petitioner claimed that his right of privacy would be violated by the police maintenance of records of his arrest because

> present day technology and modern police investigatory procedures have combined to produce a situation in which the arrested individual has a criminal record on file in at least one or more law enforcement centers; .... it is widely known that local and state law enforcement agencies forward their data pertaining to arrests to the Federal Bureau of Investigation ...; there is incalculable economic and personal harm to an individual that results if his arrest

---

8. Specific legislative authority to expunge criminal arrest records existed only in connection with certain drug cases. *See Wheaton*, 273 Md. at 273 n. 8, 329 A.2d 35. In 1974, a "bill broadly authorizing the expungement of such records, enacted at the 1974 Session of the Legislature (House Bill 122), was vetoed by the Governor for reasons wholly unrelated to the merits of the expungement concept." *Id.* at 275–76, 329 A.2d 35 (citing Laws of Maryland, 1974 at 3090).

becomes known to employers, credit agencies or even neighbors; and ... notwithstanding the absence of a conviction, the mere record of arrest often works as a serious impediment and basis of discrimination in the search for employment, in securing professional, occupational or other licenses, and in subsequent relations with the police and the courts.

*Id.* at 266, 329 A.2d 35. The Court of Appeals considered the issue of whether to afford petitioner expungement of his arrest record based on either a constitutional right of privacy similar to that recognized in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), or a common law right to privacy. It found the issue to be "complex" and to involve "the balancing of the state's interest in efficient law enforcement procedures as against a particular citizen's right to be let alone." *Wheaton,* 273 Md. at 271–72, 329 A.2d 35 (quoting *Davidson v. Dill,* 180 Colo. 123, 503 P.2d 157, 162–63 (Colo.1972)). After reviewing cases from other jurisdictions, the Court recognized that the right of privacy is protected by the Constitution. It cautioned, however, that,

'the definitions of privacy which the *Griswold* approach offers are at best descriptions of a widely shared emotional attitude. Analytically, the reasoning of *Griswold* and *Wade* offers no guidance for separating what privacy is from what it is not; it offers no generalizable definition of the right it is used to protect.'

*Id.* at 272, 329 A.2d 35 (quoting *Note, Privacy in the First Amendment,* 82 Yale L.J. 1462, 1476 (1973)).

Without reaching a definitive conclusion as to whether a common law or constitutional right to expungement existed, the Court of Appeals simply held that the lower court had erred in holding that it did not have subject matter jurisdiction even to consider the issue, and remanded the case to the lower court. *See id.* at 276, 329 A.2d 35. It directed the trial court to conduct further proceedings to allow development of sufficient facts to allow inquiry into the propriety of granting

the petitioner such relief under the particular circumstances of his case. *See id.* This issue became unnecessary to decide when, in the next session of the legislature in 1975, our current expungement statute was adopted.[9]

Our study of *Wheaton* reveals two important points. First, we learn that it is society's concern with individual privacy that evokes its recognition of an individual's need for expungement of a criminal record under certain circumstances. In other words, our society accepts that persons formally accused, but not convicted, of a crime should not be tainted with that arrest record in the pursuit of employment, education, licensing, financial transactions, or the like. Second, the individual's interest in privacy regarding such matters must be balanced against the State's interest in efficient and effective law enforcement procedures. We believe that it is these considerations that caused the legislature to enact Maryland's current expungement statute in 1975.

Two federal courts, one reviewing Maryland's statute and another examining a similar federal statute, reached comparable conclusions about the underlying purpose of expungement statutes. In 1993, the Fourth Circuit, in *United States v. Bagheri,* 999 F.2d 80, had occasion to comment briefly upon the purpose of Maryland's expungement statute. It observed that the primary evil sought to be avoided by this and similar statutes is to "prevent consideration of expunged records by parties *other than the State of Maryland.*"[10] *Id.* at 84 (emphasis added). The United States Court of Appeals for the District of Columbia, in *Doe v. Webster,* 606 F.2d 1226 (D.C.Cir.1979), analyzed in more depth the Federal Youth Corrections Act, which provides that "[w]here a youth offender has been placed on probation by the court, the court may

---

**9.** We do not know what transpired on remand in *Wheaton,* as there is no further procedural history reported. We surmise that the outcome of the case may have been affected by the subsequent enactment of Maryland's expungement statute.

**10.** Bagheri did not address the specific issue of the present case, and its facts are inapposite.

... unconditionally discharge [the youth] from probation ... which discharge shall automatically *set aside* the conviction...." *Id.* at 1229 n. 5 (citing 18 U.S.C. § 5021(b) (emphasis added)).[11] The plaintiff in that suit had been previously convicted and his conviction was set aside pursuant to the Youth Corrections Act.

The plaintiff in *Webster* was not satisfied with the relief that he had previously been given, *i.e.*, a certificate that his conviction was set aside, entitling him to removal of the "so-called 'legal' disabilities which attach to a criminal conviction ... [such as] loss of the right to vote, to hold public office, ... to serve as a juror" and others. *Id.* at 1233–34. Rather he sought a court order requiring physical destruction of all records pertaining to his crime, contending that the existing records had a "chilling effect on his employment, travel, bar admission, and career opportunities." *Id.* at 1229. The government, on the other hand, considered the certificate, and the restoration of those rights falling within the "legal disabilities" to be sufficient, and asked the court to hold that no records need be hidden or destroyed. The *Webster* Court considered both parties' positions overreaching and adopted a middle ground.

The court in *Webster* first examined the legislative history of the statute and quoted one of the drafters of the legislation, who testified that

the Act does provide for the wiping out of the conviction if the youth is discharged, rehabilitated, and behaves himself well after his period of supervision. The purpose of that is to help him get a job and keep him from having to be turned down by a prospective employer because of the fact that he has a conviction.

*Id.* at 1236 (quoting Chief Judge Orie L. Phillips of the United States Court of Appeals for the Tenth Circuit during Hearings

---

**11.** The court construed the term "set aside" to be the general equivalent of "expunge."

on S. 1114 and S. 2609 Before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st Sess. 7 (1949)).

Given this goal, the court considered it "unrealistic" to suppose that a "youthful ex-offender can be made sufficiently whole by means of a simple notation in his official records that the [official] conviction has been set aside and issuance of a certificate to that effect." *Id.* at 1238. It stated:

[U]nless the slate is wiped clean in such a way that the FBI will not disclose, and the youthful ex-offender whose conviction was set aside may legally deny, the existence of that previous conviction, he will almost inevitably and forever bear its stigma in terms of both social relationships and economic opportunities.

*Id.* at 1239. The court simultaneously recognized, however, that the government has "a legitimate need for maintaining criminal records in order to efficiently conduct future criminal investigations." *Id.* at 1243. It observed that "police investigators will be greatly assisted if they are able to check whether persons residing or having been observed at the situs of an offense involving a particular *modus operandi* had previously been arrested or convicted of an offense involving the same *modus operandi.*" *Id.* at 1243. Underlying its holding was the court's recognition that "[l]aw enforcement authorities have an interest in knowing, for example, that a definite suspect in a crime under investigation had previously been arrested or convicted, especially if for a similar offense." *Id.*

The solution of the *Webster* Court was to deal with the set aside or expunged record as follows:

[They] must be physically removed from the central criminal files and placed in a separate storage facility not to be opened other than in the course of a bona fide criminal investigation by law enforcement authorities and where necessary for such an investigation. These records may not be used by [the government] for any other purpose, nor may they be disseminated to anyone, public or private, for any other purpose.

*Id.* at 1244. Thus, *Webster* balanced the interests of the individual in privacy and the interests of society in law enforcement.

The strong interest possessed by law enforcement agencies in maintaining records of prior criminal conduct was well expressed by the Illinois intermediate appellate court, in a case cited by the Court of Appeals in *Wheaton.* The Illinois court explained:

'In considering the right of the public we must take into consideration the increasing incidence of crime, particularly crimes of violence and crimes involving sex. . . . Interposed against this is the right of the individual to privacy. . . . It is true that under our system of jurisprudence no person is guilty of a crime until he has been convicted thereof. However, . . . "[t]he extent of the actual harm which may befall the injured citizen, is at most, conjectural. On the other hand, the extent of the possible danger to an effective system of law enforcement is considerable. The innocent person of today, unfortunately, may be tomorrow's criminal. The day before some poor soul kills his fellow man, he is an innocent person. The minute possibility that his previously obtained identification records may help to apprehend him and prevent further tragedy is . . . substantial enough to outweigh the alleged invasion of his right of privacy." '

*Wheaton,* 273 Md. at 267–68, 329 A.2d 35 (quoting *Kolb v. O'Connor,* 14 Ill.App.2d 81, 142 N.E.2d 818, 822 (Ill.App.Ct. 1957), in turn quoting *Sidney M. DeAngelis,* 27 Temp. L.Q. 441).

The cases discussed above make it clear that an individual's need for expungement of a criminal arrest record is founded upon a societal sense that individuals should not suffer in their employment or advancement in society as a result of 1) criminal prosecutions in which no crime was ever proven, or 2) certain limited criminal convictions from which they have been rehabilitated. The individual's need for expungement, however, does not extend to protecting against future criminal

prosecution, and the individual's privacy interest must be balanced against society's need for efficient law enforcement.

The Maryland Legislature took into account this balance when enacting the current expungement statute. In framing the statute, it did not define "expungement" as total destruction of court records or police records, but rather as "the effective removal of these records from *public* inspection." Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 735(c) (emphasis added). The statute provides three methods by which such removal from public inspection can be achieved:

(1) By obliteration;

(2) By removal to a separate secure area to which the public and other persons having no legitimate reason for being there are denied access; or

(3) If effective access to a record can be obtained only by reference to other records, by the expungement of the other records, or the part of them providing the access.

*Id.* There is no suggestion that the legislature had any intent to preclude law enforcement officials from legitimate access or use of records to investigate and prosecute criminal conduct.

### Consideration of "Investigatory files" and "Work-product" Exceptions in Light of Statutory Goals

Keeping the goals of the expungement statute in mind, we now return to the specific language creating the exception for "investigatory files" and "police work-product records used solely for police investigation purposes." We interpret this language in a manner which maintains consistency with the overall purpose of the statute and the statutory definition of "expungement." We conclude that inclusion of these statutory exceptions was intended to make clear that police are allowed to maintain, away from public view, files that contain documents facilitating ongoing police efforts to identify and gather evidence of suspected criminal conduct. The ultimate purpose of such tasks, obviously, is the prosecution of the person suspected of criminal conduct through our criminal justice

system. The limitation that "police work-product records be used solely for police investigatory purposes" tells us that the police cannot maintain or utilize expunged records for purposes other than law enforcement, such as to interfere with or reduce the prospect that an individual who was the subject of such records might gain future employment, educational opportunities, or other advancement in society. This principle has been long recognized at common law as well. The Court of Appeals, in *Downs v. Swann*, 111 Md. 53, 73 A. 653 (1909), cautioned that the Court would not

> countenance the placing in the 'rogues gallery' of the photograph of any person, not a habitual criminal, who has been arrested but not convicted on a criminal charge .... Police officers have no right to needlessly or wantonly injure in any respect persons whom they are called upon in the course of their duty to arrest or detain ....

*Id.* at 64, 73 A. 653 (quoted in *Wheaton*, 273 Md. at 274–75, 329 A.2d 35).

### Application of the Statutory Exceptions to the Present Case

█ Having examined the purposes of the statute, and in particular, the investigatory files and work-product exceptions, let us turn back to Mora's contentions about how expunged records were used illegally in this case. Mora does not detail specific files or documents that he contends were introduced into evidence contrary to the expungement order. Rather, he objects to the testimony of several police officers because they were testifying about, and making reference to, their prior application for and execution of search warrants, and to inventories of evidence prepared by police during certain searches. Mora contends that the testimony was objectionable because these searches were conducted in the course of investigating the three prior cases that were expunged pursuant to Article 27, section 737. He also objects to the police even utilizing these files, short of testifying about them, to develop evidence in this case. We reject both of appellant's contentions.

The applications for search warrants, inventories of evidence seized pursuant to search warrants, and names of and statements by individuals found on Mora's premises with CDS upon execution of these warrants is precisely the sort of information that the police need to maintain for the purpose of ongoing criminal investigation designed ultimately to culminate in prosecution. Also useful for ongoing investigation are the results of searches conducted away from Mora's residence of persons possessing CDS and evidence linking Mora with CDS. All of this certainly is information that was created by police work. Police do the investigation to support the application for a search warrant, and they present the application, supported by the police affidavit, to a judge to obtain the warrant. Police also conduct the search and prepare the inventory reports that list items found during the search. Similarly, police were doing investigative work when they questioned and searched persons suspected of participating with Mora in drug transactions, such as the search at the Amtrak train station testified to by Sergeant McCullen. Most of this work would be considered investigatory,[12] and all of it falls within police work-product.

The records pertaining to this work are not records of Mora's arrest and charges brought against him which, absent expungement, could be obtained by a criminal records check that certain employers and others are authorized to conduct.[13]

---

**12.** See Title 4, Chapter 600 of Maryland Rules, titled "Criminal Investigation and Miscellaneous Provisions," which includes rule 4–601, addressing the procedures for application for a search warrant, affidavit for search warrant, the search warrant return, and inventory reports of property seized.

**13.** *See* Md.Code (1984, 1991 Repl.Vol. & 1997 Supp.) §§ 5–561 to –563 of the Family Law Article (requiring criminal background investigations for employees of facilities that care for or supervise children); Md.Code (1982, 1996 Repl.Vol. & 1997 Supp.) § 19–1902 of the Health General Article (requiring criminal background investigations of employees of adult dependant programs); Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 754C (allowing criminal background checks of taxicab license holders in Montgomery County, Maryland). *See also* Md.Code (1992) §§ 11–316, –818 of the Business Regulation Article (requiring a crimi-

Nor are they court records,[14] which are available for public inspection unless expunged. The type of information in the files subject to question in this case is not information that is available to anyone other than the police.[15] This type of information maintained by the police is exactly what the legislature intended to exempt from expungement when it enacted section 735 of Article 27.

Mora contended at oral argument that the expungement statute cannot be interpreted to allow broad police access because such interpretation is at odds with Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 739(c). Section 739 makes it "unlawful for any person having or acquiring access to an expunged record to open or review it or to disclose to another person any information from it without an order from the court which ordered the record expunged, or, in the case of police records expunged pursuant to § 736, the District Court having venue." *Id.* at 739(a).

---

nal background review of prospective buyers or operators of horse racing facilities).

**14.** Court records would include the application for statement of charges, statement of probable cause, and the record of ultimate disposition in the case.

**15.** Disclosure of this information for any purpose other than police investigative purposes, including testimony about the investigation, would violate Article 27, section 739, for its exemption from the expungement statute is predicated on its status as an "investigatory file." We construe an "investigatory file" to be one which by its nature is not open for public inspection. Public disclosure of police work-product would also disqualify such records from exemption under section 735(e) because such disclosure would not be "solely for police investigative purposes." We note that there is no potential that police would be required to disclose such information under Maryland's Public Information Act, Md.Code (1993, 1995 Repl.Vol. & 1997 Supp.) §§ 10–611 to 628 of the State Government Article. Under section 10–618(f) of the Public Information Act, the custodian of the records may deny inspection to the public of all "records of investigations conducted by . . . a police department" and inspection of any "investigatory file compiled for any law enforcement, judicial . . . or prosecution purpose[.]"

■ Mora, focusing on subsection (c) of section 739, insists that the general prohibition from review or disclosure of police records must include police review of such records in the course of a prosecution. Mora rests this contention on the language in subsection (c), titled *"Ex parte* order", which provides as follows:

Upon a verified petition filed by the State's Attorney alleging that the record is needed by a law enforcement agency for purposes of a pending criminal investigation and that the investigation will be jeopardized or that life or property will be endangered without immediate access to the record, the court may enter an ex parte order, without notice to the person, permitting such access. An ex parte order may permit a review of the record, but may not permit a copy to be made of it.

*Id.* at § 739(c). Appellant argues that if it were contemplated that police could retain access to such records as prior search records and evidence inventories used in expunged cases, then there would be no need for the law enforcement agency to petition the district court to review records under section 739. We see section 739 in a different light.

We think sub-section (c) was created in order to provide a means for a law enforcement agency to have access to the expunged record for purposes of an ongoing investigation *if* the agency had not maintained an investigative file containing information located in that record. It does not mean the police *could not* maintain such information on file, but simply provides a means for them to access the information if they *did not* do so. Nor does it mean that the expungement statute was designed to protect an individual whose records were expunged from legitimate law enforcement investigation *or prosecution.*

Mora asks us to hold that once a case has been expunged, then all files relating to investigations previously performed in connection with that case cease to be investigatory files. Mora's interpretation of the statute would require us to differentiate between the police function of gathering factual infor-

mation relating to crime and the police function of testifying about that information in court. We reject any such distinction because we think that testimony in court about police investigative work, including references to "investigatory files", is part and parcel of the investigatory process.

### Mora's Indirect Attack on the Prosecutorial Right of *Nolle prosequi*

Mora contends in his brief that for the State to have dismissed charges in three prior suits, and then recharge a fourth time after expungement of the records in those suits was ordered, is "an abuse of process." It becomes apparent that what Mora really objects to is not that expunged records were used, but that the prosecutor was allowed to enter a *nolle prosequi* in the prior cases, and then reinitiate prosecution against him based upon the same evidence. Unfortunately for Mora, the broad discretionary right of a prosecutor to enter a *nolle prosequi*, and thereafter institute new charges based on the same facts is well established law. *See, e.g., Ward v. State*, 290 Md. 76, 427 A.2d 1008 (1981). A review of the rules relating to the prosecutorial right of the State to use a *nolle prosequi* shows no abuse of prosecutorial discretion in this case.

Maryland Rule 4–247(a) provides in pertinent part: "The State's Attorney may terminate a prosecution on a charge and dismiss the charge by entering a nolle prosequi on the record in open court. The defendant need not be present in court. . . ." This procedure is "simply the prosecution's abandonment of a charging document, count or part of a count." *Hooper v. State*, 293 Md. 162, 168, 443 A.2d 86 (1982). "It is well settled by the authorities that a *nolle prosequi* ordinarily does not operate as a pardon; but that the accused remains subject to be proceeded against by another indictment for the same offence." *Ward*, 290 Md. at 84, 427 A.2d 1008 (quoting *State v. Morgan*, 33 Md. 44, 46 (1870)). The entry of a *nolle prosequi* does bar prosecution under the *same* charging document; however it does not preclude future prosecution under a new or different charging document. *See id. Accord, Dealy v. United States*, 152 U.S. 539, 542, 14 S.Ct.

680, 681, 38 L.Ed. 545 (1894) (stating "a nolle [prosequi] works no acquittal, and leaves the prosecution just as though no such count had ever been inserted in the indictment").

"The entry of a nolle prosequi is generally within the sole discretion of the prosecuting attorney, free from judicial control and not dependent upon the defendant's consent." *Ward,* 290 Md. at 83, 427 A.2d 1008. Provided it is in open court, the State has an absolute right, without court approval, to enter a *nolle prosequi* to charges. *See Gray v. State,* 38 Md.App. 343, 357, 380 A.2d 1071 (1977).

The prosecutor's broad authority to enter a *nolle prosequi* is not unfettered, but judicial oversight of such authority has been limited to two types of instances. The first is where the *nolle prosequi* was entered after jeopardy had attached and under circumstances where "fundamental fairness" would be violated. *See Hook v. State,* 315 Md. 25, 37, 553 A.2d 233 (1989). The Court in *Hook* ordered a new trial where the prosecutor, near the end of the trial, entered a *nolle prosequi* as to the charge of second degree murder, thereby leaving the jury with reduced options: to convict for first degree murder or acquit on the murder charge. The Court held that such a practice is contrary to "fundamental fairness" where the evidence could support a verdict of second degree murder rather than first degree. *See id.* at 37–38, 553 A.2d 233. Unlike *Hook,* however, there is no suggestion that the entry of the *nolle prosequi* in any of Mora's district court cases occurred after the attachment of jeopardy.

The second restraint on an entry of a *nolle prosequi* is when it is entered with the purpose of circumventing speedy trial requirements. *See Ross v. State,* 117 Md.App. 357, 370, 700 A.2d 282 (1997), *cert. denied,* 348 Md. 334, 703 A.2d 1265 (1998) (holding that when the State enters a *nolle prosequi* with the intent to circumvent the 180 day limit of Article 27, section 591, and Rule 4–271, double jeopardy will preclude reinitiation of charges). Mora does not contend, nor is there any evidence in the record, that the entry of the *nolle prosequi* in any of the three prior cases involving Mora was done in order to circumvent the speedy trial requirements.

■ Moreover, there is no proffer by Mora as to how the dismissals in the district court cases encroached, in *any* respect, on his right to a fair trial. Judicial acceptance of Mora's contention that expungement of his previous charges precludes further prosecution based on the facts learned in earlier investigations would have serious implications. Such a holding would severely and unacceptably limit the State's use and right to enter a *nolle prosequi.* This is evident when one considers that under section 737 of Article 27, a defendant may petition for expungement any time a *nolle prosequi* is entered. Further, a defendant may do so immediately after entry of the *nolle prosequi* simply by signing, as Mora did, a release of all tort actions arising from the incident. *See* Md.Code (1957, 1996 Repl.Vol. & 1997 Supp.), Art. 27 § 737(d)(2)(i)(1). Under Mora's interpretation of the expungement statute, a defendant could effectively negate the prosecutorial right to re-charge after entry of a *nolle prosequi* simply by a prior expungement.

To summarize, we are satisfied that the purpose of the expungement statute is to protect the individual privacy interests in relation to efforts to obtain employment, education, and the like. There is no suggestion, either in the words of Maryland's expungement statute or in judicial interpretation of this, or similar statutes, that the legislative purpose included any intention to protect a person from further criminal prosecution because of past criminal proceedings that do not implicate double jeopardy or speedy trial rights. Yet, that is precisely what Mora aims to do by his aggressive interpretation of the expungement statute. For the reasons expressed above, we do not accept appellant's reading of the expungement statute, and hold that the trial court was correct in its ruling on his motion to suppress, and his objection to the trial testimony of the police officers.

## II.

## DISCLOSURE OF WITNESS INFORMATION

Appellant next contends that the State violated Maryland Rule 4–263(b) which states, in pertinent part:

Upon request of the defendant, the State's Attorney shall: ... [d]isclose ... to the defendant the name and address of each person then known whom the State intends to call as a witness at the hearing or trial to prove its case in chief or to rebut alibi testimony;

\* \* \*

This Rule does not require the State to disclose: ... [a]ny other matter if the court finds that its disclosure would entail a substantial risk of harm to any person outweighing the interest in disclosure.

Mora alleges that the failure by the prosecutor promptly to furnish names and addresses of all witnesses jeopardized his case because it restricted his counsel's ability to contact the witnesses before trial and thus inhibited the proper preparation of a defense. More specifically, Mora alleges that the lower court erred in denying his motion to dismiss, motion to compel discovery, and motion *in limine* to exclude the witnesses' testimony, all based upon a violation of the discovery rule. Further, he alleges that the court erred in denying his motions for mistrial, first, during the opening statement by the prosecutor when she referred to witnesses whose addresses were not provided to the defense, and second, at the end of the State's case.

Mora's argument concerns five witnesses. With regard to the first witness, Mr. Wiley, Mora argued that the address given to him by the State was not current and that he was unable to contact the witness. The State contended that the address given to Mora was the only address of record, and it had issued a subpoena for him (presumably at that address) which had not been served. The judge ruled that if Mr. Wiley showed up to testify, the defense would have an opportunity to interview him prior to his testimony.

Two other witnesses, Ms. Romano and Mr. Woods, were placed in a witness protection program by the State at their request due to expressed fear of Mora. At a pre-trial motion hearing, the State moved for a protective order limiting

disclosure of the addresses of these witnesses based upon their fear of the defendant. The motion was denied. Subsequently, the State gave the names of these witnesses to defendant, along with their last known address prior to relocation, but not their current locations. The prosecutor proffered that she had spoken with the two and offered them the opportunity to speak with defense counsel. She said that they both declined to do so. At trial, the court ruled, as it did with the other witnesses, that prior to their testimony, they would be made available to the defense for interviewing.

The fourth witness was Angela Dorsey. The State provided the defense with an address for Ms. Dorsey, but the defense alleged that it was not current. Once again, the court ruled that the defense would have the opportunity to speak with the witness if the witness was inclined to do so.

Prior to the testimony of each of these witnesses, the court inquired of them as to whether they wished to speak to the defense. All four declined.

A fifth witness, Deborah Moore, whose address the defense also alleged was not current, did elect to talk with defense counsel before her trial testimony. Mora challenges the trial court's ruling with respect to Ms. Moore, claiming that talking to witnesses immediately prior to their testimony is of limited value. At that point, Mora contends, a defendant has no opportunity to review and investigate the witness's assertions in order to determine her truthfulness.

From the record, it appears that the State may well have violated Maryland Rule 4–263, requiring disclosure of the names and addresses of witnesses. The determination of what, if any, sanction will be imposed for a violation of discovery is "in the first instance committed to the discretion of the trial judge. The exercise of that discretion includes evaluating whether a discovery violation has caused prejudice." *Warrick v. State,* 302 Md. 162, 173, 486 A.2d 189 (1985) (citations omitted). The trial court addressed any prejudice to defendant arising from this violation by giving the defense the opportunity to interview those witnesses outside of the pres-

ence of the jury, if the witnesses were willing. The trial judge believed that, under the circumstances, such remedy was sufficient to address any potential for prejudice to the defendant.

Our Court of Appeals has stated clearly the limited role of an appellate court when reviewing a ruling on a discovery dispute: "We fully recognize that ruling on discovery disputes, determining whether sanctions should be imposed, and if so, determining what sanction is appropriate, involve a very broad discretion that is to be exercised by the trial courts." *North River Ins. Co. v. Mayor of Baltimore,* 343 Md. 34, 47, 680 A.2d 480 (1996). A trial court decision will be disturbed only if there is an abuse of discretion. *See id.* We find no abuse of discretion in this case.

 It was made clear at trial that all of the names of the witnesses were disclosed. In addition, it was clear that addresses of the witnesses were provided, with the exception of the current addresses of two witnesses in protective custody. Although Mora contends that none of the addresses provided to him were current, he has not made any showing that the State knew of more accurate addresses, except as to the two witnesses in protective custody. The trial judge assured Mora that he would allow him to interview the witnesses once they became available, and in fact, prior to each of the witness's testimony, the judge and counsel had a bench conference to ask each individual witness if they wished to speak to defense counsel. All but one of the five witnesses declined to do so. We see no basis to conclude that these witnesses would have been more inclined to speak with defense counsel if contacted prior to trial. As to the one witness who did speak with defense counsel, Mora offers no substantive support for his bald allegation that an earlier conversation with that witness would have benefitted the defense in a substantive manner. While the trial judge, in his discretion, could have elected to exclude the witness's testimony, we see no abuse of discretion by the court or prejudice to appellant in his refusal to do so.

## III.

## SUFFICIENCY OF THE EVIDENCE

 Mora also contends that there was insufficient evidence to support his convictions. The standard for our review of the sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bloodsworth v. State*, 307 Md. 164, 167, 512 A.2d 1056 (1986), *cert. denied*, 313 Md. 688, 548 A.2d 128 (1988) (emphasis in original). This standard applies to all criminal cases, including those resting upon circumstantial evidence, *see Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992), since, generally, there is no difference between guilt based in whole or in part on circumstantial evidence and guilt based on direct evidence. *See Mangum v. State*, 342 Md. 392, 398, 676 A.2d 80 (1996). "[C]onviction upon circumstantial evidence *alone* is not to be sustained unless the circumstances are inconsistent with any reasonable hypothesis of innocence." *West v. State*, 312 Md. 197, 211–12, 539 A.2d 231 (1988) (emphasis in original).

 Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder. *See Binnie v. State*, 321 Md. 572, 580, 583 A.2d 1037 (1991). "In this regard, it may believe part of a particular witness's testimony, but disbelieve other parts . . . ." *Pugh v. State*, 103 Md.App. 624, 651, 654 A.2d 888, *cert. denied*, 339 Md. 355, 663 A.2d 73 (1995). The limited question before an appellate court is "not whether the evidence *should have* or *probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State*, 85 Md.App. 231, 241, 583 A.2d 1065, *cert. denied*, 322 Md. 614, 589 A.2d 57 (1991) (emphasis in original).

In this case, Mora was convicted of violating Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 286(a)(5) which, in pertinent part, makes it unlawful to

> keep or maintain any common nuisance which means any dwelling house, apartment, building, vehicle, vessel, aircraft, or any place whatever which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia, as defined in § 287(d) of this subheading ....

Mora argues that there was no evidence to refute Mrs. Mora's testimony that she, not her husband, controlled the property and that it was owned by her father.

We discussed the issue of control in *Anderson v. State*, 9 Md.App. 532, 267 A.2d 296 (1970). There, we held that evidence was sufficient to support the defendant's conviction for maintaining a premises for selling narcotics, when defendant admitted a relationship with the legal tenant of the property and his actions of selling heroin were observed by police officers for a period exceeding one month. *See id.* at 540, 267 A.2d 296.

The Court of Appeals has stated that "[c]ircumstantial evidence is to be viewed 'not like a chain which falls when its weakest link is broken, but ... like a cable ... [which] "does not depend upon one strand." ' " *Wilson v. State*, 319 Md. 530, 536, 573 A.2d 831 (1990) (quoting *Pressley v. State*, 295 Md. 143, 150, 454 A.2d 347 (1983)). "Thus, where physical circumstantial evidence and witness observation or other independent circumstantial evidence 'point in the same direction, reinforcing and corroborating each other,' a determination of guilt 'is no longer dependant upon a single strand of circumstantial evidence but rather upon a cable made up of multiple strands.' " *Davis v. State*, 100 Md.App. 369, 390, 641 A.2d 941 (1994) (quoting *Eiland v. State*, 92 Md.App. 56, 70, 607 A.2d 42 (1992), *rev'd on other grounds*, 330 Md. 261, 623 A.2d 648 (1993)).

██ Mora's admitted relationship as the husband of the legal possessor of the property, the observation of his activities over a sufficient period of time by police officers, and the testimony of persons who sold CDS for him are sufficient to conclude, beyond a reasonable doubt, that he was in possession of the property for the purpose of maintaining a common nuisance.

We find the evidence sufficient to sustain appellant's convictions.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**